### UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| RITA ABSHER,<br><br>PLAINTIFF,<br><br>VS.<br><br>FLEXIINTERNATIONAL SOFTWARE,<br>INC. AND JAY BELSKY,<br><br>DEFENDANTS. | CIVIL ACTION<br>NO. 3:02 CV 171 (AHN)<br><br><br><br><br><br>September 8, 2004 |

### MEMORANDUM OF LAW IN SUPPORT OF MOTION
### FOR SUMMARY JUDGMENT

**I.     INTRODUCTION**

The Plaintiff, Rita Absher, was an employee at will of the Defendant, FlexiInternational, Inc., of Shelton, Connecticut, from 1998 to her lay off from employment effective April 30, 2001. In thirteen counts in her Amended Complaint dated May 6, 2003, she presents an array of allegations of discrimination and state law claims arising from her employment and termination, including one count against a fellow employee, the co-defendant, Jay Belsky.

However, the proximate cause of Ms. Absher's lay off was a lack of work in her department, along with her own unsatisfactory conduct. The undisputed facts, including

her version of the alleged sexual harassment by Mr. Belsky, do not support any of her causes of action.  The Defendants therefore move for summary judgment as to all counts of the Amended Complaint.

## II.   THE PLAINTIFF'S CLAIMS

Twelve of the thirteen counts in the Amended Complaint are directed to the defendant, FlexiInternational, Inc. ("Flexi"), and one, the Eleventh Count, is directed to the co-defendant, Jay Belsky.  However, the twelve counts against Flexi seem only to encompass six different claims, so that for the purpose of this motion, the Defendants have consolidated the counts as follows:

### A.   First and Fifth Counts: Sexual Harassment

The First Count is labeled "Hostile Work Environment, Title VII of the Civil Rights Act of 1964," and describes various allegedly offensive workplace encounters between Ms. Absher and Mr. Belsky.  The Fifth Count is labeled "Sexual Harassment, Conn. Gen. Stat. §46a-60(a)(8)," but simply refers to "foregoing conduct" (§46), without attribution to an earlier count or other fact pleading.

Since Section 46a-60(a)(8) of the Connecticut General Statutes is explicitly directed to sexual harassment, defined in part as the creation of a hostile work environment, and is the state law version of the cause of action under Title VII for a claim of hostile environment sexual harassment, Meritor Savings Bank v. Vinson, 477

2

U.S. 57, 106 S. Ct. 2399 (1986), the First and Fifth Counts seem to be the federal and state law claims applicable to the allegations of sexual harassment, and will be addressed together in this motion.

### B. Second, Third and Sixth Counts: Gender Discrimination in Terms of Employment

The Second Count is labeled "Discrimination on the Basis of Gender, Title VII of the Civil Rights Act of 1964," and the Third Count is labeled "Hostile Work Environment, Title VII of the Civil Rights Act of 1964." However, the allegations of the Second Count, a list of supposed discrepancies in bonuses and stock options between male and female employees, are repeated verbatim in the Third Count, leaving the labels as the only difference between the two Counts. A hostile work environment is generally defined as a workplace permeated with discriminatory intimidation so severe or pervasive as to alter the work environment, Schwapp v. Town of Avon, 118 F.3d. 106, 110 (2d. Cir. 1997), which does not accord with the allegations of the Third Count concerning bonuses and stock options. Disregarding the labels, the Third Count is merely duplicative of the Second Count.

The Sixth Count contains no substantive allegations, but its label, "Discrimination Based on Sex, Conn. Gen. Stat. §46a-60(a)(1)," seems to make it the state law counterpart of the Second Count, which is directed to discrimination based on gender under Title VII. Since the Second, Third, and Sixth Counts all seem to be state and

3

federal law causes of action based upon the claims of disparate compensation in bonuses and stock options, this motion will address the three counts together.

### C.     Fourth and Seventh Counts: Retaliation

The Fourth and Seventh Counts are identical, alleging claims of retaliation under federal and state law causes of action, and will be addressed together in this motion.

### D.     Eighth, Ninth and Tenth Counts: Contractual Claims

Although the Eighth Count is labeled "Breach of Implied Contract," the Ninth Count, "Breach of Covenant of Good Faith and Fair Dealing," and the Tenth Count, "Promissory Estoppel," they contain identical allegations to the effect that the words, conduct and actions of Flexi created some form of contract.  In Connecticut law, an implied covenant of good faith and fair dealing presupposes a contract to which the covenant applies, Habetz v. Condon, 224 Conn. 231, 238 (1992), and the alternate theories of contract formation of implied contract and promissory estoppel both depend upon the existence of a clear and definite promise.  See Finley v. Aetna Life & Casualty Co., 50 Conn. App. 394, 409 (1985), reversed on other grounds, 202 Conn. 190 (1987)(an offer must be definite in form) and D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 214 (1987)(representations must be sufficiently promissory and sufficiently definite to support contractual liability).

4

Since the basis for summary judgment on these counts will be the employment at will relationship between Ms. Absher and Flexi, and Flexi's disclaimer of contract, the alternate theories of the Eight, Ninth and Tenth Counts will be addressed together in this motion.

**E.      Eleventh Count: Assault by Mr. Belsky**

**F.      Twelfth Count: Negligent Supervision**

**G.      Thirteenth Count: ERISA**

These last three counts have no counterparts, and will each be addressed separately in this motion.

**III.    STANDARD FOR SUMMARY JUDGMENT**

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2510 (1986). The moving party has the burden of identifying the evidence that it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 US 317, 323, 106 S. Ct. 2548, 2552-2553 (1986). In determining whether summary judgment is appropriate, the court resolves all ambiguities and draws all reasonable inferences

against the moving party. <u>Cifarelli v. Village of Babylon</u>, 93 F.3d. 47, 51 (2d. Cir. 1996). However, only disputes of material fact preclude summary judgment. <u>Yoon v. Fordham University Retirement Plan</u>, 263 F.3d. 106, 200 (2d. Cir. 2001).

Summary judgment is no more disfavored for discrimination cases than for any other case. <u>James v. New York Racing Association</u>, 233 F.3d. 149, 154 (2d. Cir. 2000). The court must be cautious in a discrimination case when the employer's intent is in question. <u>Gallo v. Prudential Residential Services Ltd. Partnership</u>, 22 F.3d. 1219, 1224 (2d. Cir. 1994). However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment. <u>Meiri v. Dacon</u>, 759 F2d. 989, 998 (2d. Cir. 1985).

## IV.    BACKGROUND OF FACTS

FlexiInternational, Inc. provides financial software and services. In 1998, when Ms. Absher was hired, Flexi had over 300 client sites worldwide and over 200 employees. (Affidavit of Stefan Bothe, 2).

Unhappily for Flexi, times changed. "Y2K" concerns impacted the entire computer applications market, especially Flexi's accounting software market. Total revenues of $24 million in 1998 fell to $9.5 million in 2001, and active employees at the end of 2001 were only about 50. (Bothe Aff. 3). Ms. Absher acknowledged these changes in her deposition: "Actually when I started I believe there were around 250

6

employees at Flexi.  By the time I was let go, I believe they were down to about 50."

(Plaintiff Deposition, January 17, 2003, p. 25).

Ms. Absher survived Flexi's major reduction in force in 1999, but her workload

declined.  In 2001 there were two other employees with similar client service duties,

Cheryl Brennan and Cliff Gideon, who were able to undertake her minor remaining work

subsequent to her termination.  (Bothe Aff.  10, 11).  Ms. Absher acknowledged in her

deposition that a further reduction in force was projected for her department in 2001

(Ptf. dp., pp. 62-63).

Ms. Absher also admitted that by 2001 her work load, primarily as liaison for the

Flexi account with Norwest Financial, was not demanding:

> So my salary was paid by Norwest so that I could report to
> them and get fixes back to them.  Be a liaison …And that is
> what I did for most of the remainder of the time I was at
> Flexi. (Ptf. dp., p. 24)
>
> …
>
> Q.  Wasn't it important to accurately record your hours for
> the Norwest account?
>
> A.  It is pretty important I would imagine.  I believe they had
> a 600 - now that I'm looking at this, they might have had 600
> hours a year, 620, and they were in no way, shape or form
> getting close to their limit on that. (Ptf. dp., p. 72).

Six hundred hours per year is of course an average of about 11 hours per week, and Ms. Absher's own time records show that by the first quarter of 2001, she was barely achieving that level of work for Norwest. (Bothe Aff. 10, Exhibit 5).

Although the Amended Complaint attempts to portray Ms. Absher as a victim of a hostile work environment and a retaliatory firing, she was laid off because of a declining workload, and it was her actions and not Flexi's which precipitated her departure. At the beginning of 2001, Kevin Nolan, who was the vice president of client services and Ms. Absher's manager, was directed to lay off two employees from his client services group because of low revenue projections. Mr. Nolan made one lay off in February, 2001 and accepted another employee's resignation in March. However, revenue in the first quarter of 2001 was poor, and the revenue projections for Mr. Nolan's department for the second quarter also failed to meet expenses, so Mr. Nolan laid off Ms. Absher. Two other employees of the client services group, both male, were laid off in the summer of 2001, at which point the department's complement of employees was commensurate with the available work (Kevin Nolan Deposition. p. 18-19, 58-79, 82-84, 85).

On April 15, 2001, Mr. Nolan set up what should have been a routine conference telephone call of himself, Ms. Absher, and two other employees from the sales department, Cheryl Brennan and Adrian Marchi. Mr. Nolan intended to reassign offices, ,and proposed to move Ms. Absher and Ms. Brennan, who each occupied an interior

two-person-size office, to a large office to be shared on the three days per week that Ms. Brennan would be working. (Bothe Aff. 12, 13, Ex. 6).

Ms. Absher responded with what Mr. Nolan described at the time as a tirade, opposing the plan with anger and profanity, and storming out of the meeting. (Bothe Aff. 13, Ex. 6; Nolan dp. 14-16). Ms. Absher does not deny swearing, losing her temper or leaving the conference (Ptf. dp., pp. 79 - 80, 82). On Monday, April 9, 2001, Ms. Absher sent an e-mail message to Mr. Marchi, vice president of sales and customer services, and Frank Grywalski, president of Flexi, apologizing for her unprofessional conduct. (Bothe Aff. 14, Ex. 7).

However, by that time Ms. Absher had also developed an excuse. Later on Thursday, April 5, 2001, Ms. Absher complained to Rosemarie Ferraro, Flexi's human resources manager, about offensive conduct by a co-worker, Jay Belsky. Ms. Absher and Ms. Ferraro agreed that they would both address Mr. Belsky about his behavior, and they also spoke about Ms. Absher's conduct that day in the conference with Mr. Nolan on the reassignment of offices. (Ptf. dp., pp. 170-172; Bothe Aff., Ex. 8).

On the morning of Friday, April 6, 2001, Mr. Nolan met with Ms. Absher and had a long talk about her conduct and attitude, and her prospects for her future with Flexi. (Bothe Aff.15, Ex. 6). Mr. Nolan's professional services group had been unsuccessful in obtaining new business from existing clients and this endeavor was being transferred to

the sales department, but Ms. Absher stated that she did not want to work in sales.  Ms. Absher also stated that she did not want to work in product development, as it required too much travel and she did not want to be a developer.  Mr. Nolan observed that this left no work for Ms. Absher in his department or the sales department (Bothe's Aff. ¶ 22, Ex. 11; Nolan dp. p. 18-22).

Later on that Friday, Ms. Absher asked to speak again to Mr. Nolan, and attributed her outburst in the conference to the stress she allegedly felt from Mr. Belsky's conduct.  (Ptf. dp., pp. 172-174; Bothe Aff.15, Ex. 6; Nolan dp. pp. 27-28).  However, Ms. Absher later assured Mr. Nolan that she would continue to participate in an upcoming Flexi client event known as Flexi User Day.  (Bothe Aff.19, Ex. 6; Nolan dp. pp. 25-34).

On Monday, April 9, 2001, Ms. Absher reiterated her participation in Flexi User Day.  (Bothe Aff. 19, Ex. 6).  She also sent Ms. Ferraro a statement of her allegations against Mr. Belsky (Bothe Aff. 17, Ex. 9), which with some embellishment became allegations in the First Count of the Amended Complaint (§ 17).  On that same Monday, Ms. Ferraro met with Mr. Belsky and warned him, as did Mr. Grywalski, the company president, that his objectionable conduct must cease, under threat of termination.  (Bothe Aff.18, Ex. 8).

10

On Tuesday, April 10, 2001, Ms. Absher asked Mr. Nolan if she could skip participation in Flexi User Day and take some time off, ostensibly to recover from Mr. Belsky's conduct. (Nolan dp. p. 34)   Mr. Nolan and Ms. Ferraro agreed, assuming that Ms. Absher would arrange for the completion of her responsibilities for Flexi User Day. (Bothe Aff. 19, Ex. 6).  Instead, Ms. Absher went to Mexico, where her long-time fiancé maintained a charter boat business. (Bothe Aff. 19, Ex. 6, 8).   Flexi made various attempts to communicate with Ms. Absher in Mexico over the next two weeks concerning Flexi User Day, without success.  (Bothe Aff.19, Ex. 6, 10).  Consequently, the Flexi User Day event failed to the detriment of Flexi's relationship with clients. (Bothe Aff. 20).

Ms. Absher admitted that she failed to fulfil her responsibilities to give notice to clients for Flexi User Day, although she blames the stress allegedly caused by Mr. Belsky. (Ptf. dp., pp. 93-95)  Nor did she notify Flexi that the task needed to be done:

> … so now you are asking me did I remember to send out an e-mail.  I had a lot on my mind.  So I'm sorry, Mr. Zanker [sic], I didn't.
>
> Q.  Did you tell anybody before you left for Mexico that you hadn't sent out the e-mail regarding the Flexi User Day conference and that somebody ought to do that?
>
> A.  I failed to do that.  I had other things on my mind.  (Ptf. dp., p. 103)

Ms. Absher was expected to return to Flexi on Tuesday, April 24, 2001. (Ptf dp., p. 96)  She neither appeared nor called.  (Bothe Aff. 21, Ex. 6, 8).  By that time, Mr. Nolan had already decided that he would effectuate her lay off (Nolan dp. p. 58, 86 ). When Ms. Absher finally arrived at Flexi on Wednesday, April 25, 2001, Mr. Nolan told her that she was being terminated, and that her position would be eliminated because of insufficient work.  (Bothe Aff. 22, Ex. 8, 11; Nolan dp. p. 86).

## V.    FIRST AND FIFTH COUNTS:  SEXUAL HARASSMENT

Accepting Ms. Absher's version of her workplace encounters with Mr. Belsky as true for the purposes of this motion, Mr. Belsky's first offensive act occurred in August, 1999 when Ms. Absher, concerned about her mother's breast cancer, approached Mr. Belsky to ask about his experience with his wife's illness, and in his explanation he "lifted my left arm, put his finger and he drew around my left breast and they are going to cut your mother from here and here and he tapped my chest about three times."  (Ptf. dp., p. 114; Bothe Aff. Ex. 6; Amended Complaint, First Count, ¶ 17c).  Ms. Absher having filed her complaint to the Connecticut Commission on Human Rights and Opportunities on May 2, 2001 (Bothe Aff. 23. Ex. 12), this incident is well outside the statutory time limits for filing agency complaints specified in the federal and state discrimination statutes, 42 USC §2002-5(e)(1) and Conn. Gen. Stat. §46a-82(e), which

12

operate as statutes of limitations.  <u>Quinn v. Green Tree Credit Corp.</u>, 159F 3d 759, 765 (2d Cir. 1998).

The next incident was March 28, 2001 (a Wednesday), when Mr. Belsky, with Cheryl Brennan also present, held up an orange and then a yellow pad of paper next to Mrs. Absher's chest and spoke of comparing their colors to the color of her sweater. (Ptf. dp., pp. 144-145; Bothe Aff. Ex. 9, First Count, ¶ 7d)  Ms. Absher and Ms. Brennan agree that Ms. Brennan also commented on the color of Ms. Absher's sweater, and that this was actually a three-person conversation, not a confrontation of Ms. Absher by Mr. Belsky (Ptf. dp. pp. 144-145; Cheryl Brennan Affidavit, ¶ 8).

According to Mrs. Absher, Mr. Belsky often made comments about colors, holding objects in front of women to supposedly compare the color of the objects with the color of their clothing, and sometimes touching them.  (Ptf. dp., pp. 120-130)  She described the reaction of her co-workers as:

> Many of the co-workers because they would all make fun that Jay would do this.  But I don't think any one of them appreciated it and I don't think any one of us thought this was a funny little quirk.  And I don't think any one wanted to rock the boat.  (Ptf. dp., p. 128)

Ms. Absher contends that by October or November of 2000, she had begun to complain about Mr. Belsky's conduct to Rosemarie Ferraro, the human resources

manager.  (Ptf. dp., pp. 130-131)  She also complained to Ms. Ferraro about the orange

and yellow pad incident, but did not solicit her aid:

> Q.  What did you tell Rosemarie?
>
> A.  I told Rosemarie the incident.
>
> Q.  As you just described it to me?  That he held an orange
> and a yellow pad up to your chest and you told him it had to
> stop and he said he would never do it again?
>
> A. Yes.
>
> Q.  All right.  And what did Rosemarie say?
>
> A.  She didn't say anything about it.  She did volunteer to talk
> to him.  And I said no, I would.
>
> Q.  So you complained to her, she said she would talk to Jay
> and you said
>
> A.  Finally.
>
> Q.  And you said that's okay, I'll talk to him?
>
> A.  Finally, she said do you want me to talk to him.  I said I
> will talk to him.
>
> Q.    And that was the end of your conversation with
> Rosemarie?
>
> A.  Yes.  (Ptf. dp., p. 147)

The next incident was the following Monday, April 2, 2001, when Ms. Absher

asked Mr. Belsky to obtain a telephone number for her, which he did from his computer,

and then while seated in his chair "he's pointing to his screen, and in the meantime he's also like motioning me over and he ends up like petting my pelvic area. O.K. he apologizes." (Ptf. dp., p. 150; Bothe Aff. Ex. 9; First Count, ¶ 17f)  Mr. Belsky apologized, and Ms. Absher wrote down the telephone number and left. (Ptf. dp., pp. 156-157)

The next incident was the next day, April 3, 2001, when Ms. Absher and Mr. Belsky were together in his office and he apparently noticed her blazer jacket was fastened with velcro strips. He touched the blazer to look at the strips. She commented that she would not buy another such blazer because the velcro "pilled" the material of her sweater (apparently meaning knotted) (Ptf. dp., p. 162), and Mr. Belsky began to cut pieces of velcro which he had and to put them on to the strips, seemingly to prevent the pilling of the sweater. According to Ms. Absher, he also asked her how her mother was doing and then asked: "...Is she as big busted as you or as big chested as you." (Ptf. dp., pp. 160-161; Bothe Aff. Ex. 9; First Count, ¶ 17h)  Ms. Absher's response was:

> I just kind of pulled it away. And I never actually said stop. I think again it's the whole I'm shocked kind of thing. (Ptf. dp., p. 161)

The last incident occurred on Thursday, April 5, 2001, after Ms. Absher had spoken to Rosemarie Ferraro about her complaints concerning Mr. Belsky. Mr. Belsky and Ms. Absher were walking together when Mr. Belsky "draped his arm over her right

shoulder, held up a yellow-handled scissors next to her shirt and commented on the colors." (Ptf. dp., p. 167, Bothe Aff. Ex. 9; First Count, ¶ 17h)  Mrs. Absher told him this could not continue, to stop holding things up to her chest, and Mr. Belsky said he would never do it again.  (Ptf. dp., p. 168)

Other than the breast surgery discussion in 1999, Ms. Absher's specific complaints of a hostile environment may be summarized as follows:

- Wednesday, March 28, Mr. Belsky, in conversation with Ms. Brennan and Ms. Absher, holds an orange and a yellow pad in front of Ms. Absher.
- Monday, April 2, Mr. Belsky motions with his hand and touches her pelvic area.
- Tuesday, April 3, Mr. Belsky touches her blazer jacket and fasteners
- Thursday, April 5, Ms. Absher complains to the human resources manager, but shortly thereafter encounters Mr. Belsky, who puts his arm across her shoulder and holds up a scissors.

And on Friday, April 6, Rosemarie Ferraro reprimanded Mr. Belsky and warned him against any repetition of such conduct.  (Bothe Aff. Ex. 8).

In order to prevail on a claim of hostile work environment, "the plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered."

16

Alfano v. Costello, 294 F3d 365, 373-374 (3d Cir. 2002), citing Leibovitz v. New York

City Transit Authority, 252 F3d 179, 188 (2d Cir. 2001) which cited Meritor Savings

Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405 (1986).  Proof of a hostile work

environment claim must include both that the workplace was permeated with

discriminatory intimidation that was sufficiently severe or pervasive to alter the

conditions of the work environment, and that a specific basis exists for imputing the

conduct that created the hostile environment to the employer.  Schwapp v. Town of

Avon, 188 F 3d 106, 110 (2d Cir. 1997).

Factors to be considered in weighing whether an environment is hostile or

abusive include the frequency of the discriminatory conduct, its severity, whether it is

physically threatening or humiliating or a mere offensive utterance, and whether it

unreasonably interferes with an employee's work performance.  Harris v. Fork Lift

Systems, Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 371 (1993).  The alleged victim's

subjective perception that the environment is abusive is not enough; rather, an objective

reasonable person must also find the alleged behavior to be severe or pervasive

enough to create a discriminatorily hostile or abusive working environment.  Harris v.

Fork Lift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993).  "Mere utterance of

an epithet which engenders offensive feelings in an employee does not sufficiently

affect the conditions of employment to implicate Title VII."  Harris v. Fork Lift Systems, Inc., 510 U.S. at 21, 114 S. Ct. at 370 (1993) (quoting Meritor Savings Bank v. Vinson).

There is a two-year gap between the breast cancer incident described by Ms. Absher and the orange and yellow pad incident which occurred on March 28, 2001. The only even arguably offensive words attributed by Ms. Absher to Mr. Belsky in any of the incidents is the question of her being as "big busted" as her mother, which as a mere utterance is ipso facto not sufficient to alter conditions of employment.

This leaves four incidents allegedly offensive to Ms. Absher, but without any sexual content.  On March 28, in the presence of Ms. Brennan, Mr. Belsky held objects up in front of Ms. Absher, but did not touch her.  Even as described by Ms. Absher, this incident could hardly have lasted for a full minute.  The following week, on April 2, Mr. Belsky touched Ms. Absher while gesturing to her, after she had come to his office with a request for a telephone number.  Even as described by Ms. Absher, this incident seems plainly inadvertent.  On the following day, April 3, Mr. Belsky touched Ms. Absher's jacket and Velcro fasteners, an episode that again could have hardly have lasted for a few minutes.  Finally, on April 5, Mr. Belsky put his arm across Ms. Absher's shoulders and held up an object, once again a fleeting episode.  By that time, Ms. Absher had complained to the Human Resources Manager, Rosemarie Ferraro, who gave Mr. Belsky a warning.

18

While Mr. Belsky seems an annoying person to work with, the totality of his actions do not rise to the level needed to maintain a claim of hostile work environment. See Baskerville v. Culligan International Co., 50 F.3d 428, 430-431 (7th Cir. 1995) (finding no sexual harassment where the employee's supervisor made distasteful comments and gestures; it is "distasteful" to work with a "silly man", but not actionable); Phillips v. Merchants Insurance Co., 3 F. Supp. 2d 204, 208 (NDNY 1998) ("behavior that is immature, nasty, or annoying without more, is not actionable as sexual harassment").

Moreover, in order to prevail on a hostile work environment claim, a plaintiff must also prove that the conduct which created the hostile environment should be imputed to the employer. Cotcher v. Rosa and Sullivan Appliance Center, Inc., 957 F.2d 59, 63 (2d Cir. 1992). "When a co-employee - as distinct from a supervisor – is alleged to have engaged in harassing activity, the employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it." Cioffi v. The Allen Product Co., 2000 WL 33180448, at 7 (D. Conn. 2000). It is an affirmative defense for an employer to show that it exercised reasonable care to prevent and promptly correct harassment, and that the plaintiff unreasonably failed to take advantage of corrective opportunities. Faragher v. City of

19

Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998).

Although Ms. Absher claims that she spoke to the Human Resources Manager about Mr. Belsky prior to April, 2001, she also admits that with the orange and yellow pad incident, she indicated that she rather than Ms. Ferraro should talk to Mr. Belsky. When Ms. Absher complained again to Ms. Ferraro about the incident of April 5, 2001, Ms. Ferraro promptly reprimanded Mr. Belsky and warned him against any further such conduct.

Ms. Absher does not in fact accuse Mr. Belsky of any conduct with sexual content, no remarks, no innuendoes, no propositions, no intimate touching. The four episodes together could hardly have consumed ten minutes over the course of a work week, which is plainly not enough to alter the working environment. Ms. Absher herself acknowledged the insignificance of these incidents when she told Ms. Ferraro that she would handle the orange and yellow pad incident herself.

With respect to the First Count, Ms. Absher's evidence does not begin to approach the threshold of severe conduct permeating the workplace, nor can Mr. Belsky's sophomoric behavior be imputed to his employer. As to the Fifth Count, Connecticut courts have looked for guidance to federal case law interpreting Title VII, and have viewed the Connecticut fair employment practices law as co-extensive with

20

Title VII. Brittell v. Department of Correction, 247 Conn. 148, 164 (1998). If separate episodes of a touch on the thigh, a hug and a statement of love do not constitute sexual harassment, Tabachnik v. Jewish Theological Seminary of America, 2004 WL 414826 (SDNY March 4, 2004), then neither does Mr. Belsky's alleged conduct. Summary judgment may be entered for the Defendants on the First and Fifth Counts.

## VI.    SECOND, THIRD AND SIXTH COUNTS: GENDER DISCRIMINATION IN TERMS OF EMPLOYMENT

### A.    The Complaints in the Second, Third and Sixth Counts Are Untimely

In these counts (Second Count, ¶ 28; Third Count, ¶ 35), Ms. Absher complains that male employees were favored over female employees for bonus payments by Flexi, that she did not receive a bonus in 1998, 1999 or 2000, that stock options were offered to male employees in 1998 and 1999 but not to her or other female employees, and that female employees were required to share office space and be placed in cubicles, while male employees were not. The short answer to the claims concerning bonuses and stock options for Ms. Absher is that these claims have not been preserved with a timely filing to the Equal Employment Opportunity Commission or Connecticut Commission on Human Rights and Opportunities

In order to invoke the protections of Title VII of the Civil Rights Act of 1964, as Ms. Absher purports to do in the Second and Third Counts, a charge of discrimination must have been filed with the Equal Employment Opportunity Commission within 300

21

days of the alleged act of discrimination.  42 USC 2000e-5(e)(1).  This requirement functions as a statute of limitations, so that discriminatory incidents not timely charged to the Equal Employment Opportunity Commission will be time barred in a suit in District Court.  Quinn v. Green Tree Credit Corp., 159 F 3d 759, 765 (2d Cir. 1998).  Similarly, in order to invoke the Connecticut fair employment practices law, as Ms. Absher purports to do in the Sixth Count, a plaintiff is required to file an administrative charge with the Connecticut Commission on Human Rights and Opportunities within 180 days after the alleged act of discrimination.  Conn. Gen. Stat. §46a-82(e).

Ms. Absher may be expected to involve the concept of "continuing violation" in response to these obvious defects in preserving her claims.  But a failure to perform a discrete act allegedly due at a point in time, such as failure to grant a raise, or in this case pay a bonus, is not a continuing violation.  Lightfoot v. Union Carbide Corp., 110 F.3d. 898, 907 (2d. Cir. 1997) cert. denied 528 U.S. 817 (1999).

Ms. Absher's Affidavit of Illegal Discriminatory Practice (Bothe Aff. 23, Ex. 12) was filed with the Commission on Human Rights and Opportunities on May 2, 2001. The 300 days filing period extends no earlier than July 5, 2000, and the 180 day filing period extends no earlier than November 2, 2000.  Therefore, complaints concerning events occurring in 1998 or 1999 are untimely, and summary judgment may be granted for the Defendants on the Second, Third and Sixth Counts for this reason.

**B.    There Was No Discriminatory Treatment**

The allegation that Ms. Absher and other female employees did not receive a stock purchase offer in 1998 and 1999 (Second Count § 28c, Third Count § 35c) is simply incorrect.  Ms. Absher received a grant of stock options for 1999.  Of the 117 employees who received grants of stock options in 1999, 43 were women, including Ms. Absher.  (Bothe Aff. 8,9, Ex. 3, 4).  In 1998, 38 women received stock option grants.  Ms. Absher received additional stock options in January, 2001.  (Bothe Aff. 8, 9).

The allegation that Ms. Absher did not receive a bonus in 1999 or 2000 is also inaccurate.  Ms. Absher received a bonus of $3,000 for 1999, which was paid in April, 2000.  In August, 2000, she received a further payment of $2,814 as a discretionary bonus.  Of 53 employees receiving bonuses in 1999, 15 were female.  (Bothe Aff. 6, 7).

It is also incorrect that female employees were assigned to cubicles or to shared offices whereas males were not.  (Bothe Aff. 13).  Flexi had men as well as women assigned to cubicles, and in the particular instance of Ms. Absher, Flexi was attempting to move her from an interior office to an exterior office which she would share only part time.  (Bothe Aff. 13).  Moreover, office reassignments are not adverse employment actions within the meaning of the McDonnell Douglas analytical framework, McDonnell Douglas Corp., v. Green, 411 U.S. 792, 93 S. Ct. 1827 (1973), adopted in Norwalk Board of Education v. Commission on Human Rights and Opportunities, 206 Conn. 492,

504-505 (2003).  In <u>Galabya v. New York City Board of Education,</u> 202 F 3d 636, 640

(2d Cir. 2000), the court held that an adverse employment action requires a materially

adverse change, something more disruptive than a mere inconvenience or an alteration

of job responsibilities.    See also <u>Richardson v. New York State Department of</u>

<u>Corrections</u>, 180 F 3d 426, 439 (2d Cir. 1999)(isolated minor episodes do not merit

relief).    A change to a partially-shared but large office is arguably not even an

inconvenience, and is clearly not a legally cognizable adverse employment action.

Because Ms. Absher's complaints relating to bonuses and stock options are

untimely, and because in any case there was no disparate treatment between male and

female employees, summary judgment may enter on the Second, Third and Sixth

Counts of the Amended Complaint.

## VII.    FOURTH AND SEVENTH COUNTS:  RETALIATION

In the Fourth and Seventh Counts, Ms. Absher asserts a claim of termination in

retaliation for her complaints of sexual harassment, in violation of Title VII and of Conn.

Gen. Stat. 46a-60(a)(4) respectively.  To prevail on a claim of retaliation in violation of

Title VII, a plaintiff must show that:  (1) she engaged in protected participation or

opposition under Title VII; (2) the employer was aware of this activity; (3) the employer

took adverse action against her, and (4) a causal connection exists between the

protected activity and the adverse action; in short, that a retaliatory motive played a part

24

in the adverse employment action. <u>Fitzgerald v. Henderson</u>, 251 F 3d 345, 358 (2d Cir. 2001). The same principles apply to retaliation claims under the Connecticut fair employment practices law. <u>Shaw v. Greenwich Anesthesiology Associates, P.C.</u>, 137 F Supp. 2d 48 (D. Conn. 2001) (state law retaliation claims dismissed for same reasons as federal retaliation claims were dismissed).

Opposition to a Title VII violation can include complaints to management protesting discrimination, <u>Cruze v. The Coach Stores, Inc.</u> , 202 F 3d 560, 566 (2d Cir., 2000), but the conduct complained of must be unlawful, or at the least the employee's belief that it is unlawful must be reasonable. See <u>Holmes v. Long Island Railroad Company</u>, 2001 WL 797951 (EDNY 2001) (citing <u>Clark County School District v. Breeden</u>, 532 U.S. 268, 121 S. Ct. 1508 (2001).

Summary judgment may enter in favor of the Defendants on the Fourth and Seventh Counts for two reasons. First, Ms. Absher was not complaining about conduct that was unlawful under Title VII, or could reasonably be believed to be unlawful. As addressed in detail above, Mr. Belsky may have been guilty of annoying behavior, but it did not begin to rise to the level legally recognized as sexual harassment. Nor did Ms. Absher treat it as such. Although she alleges that she complained to Rosemarie Ferraro, the Human Resources Manager, about Mr. Belsky in November, 2000, when she complained again about the orange and yellow pad incident on March 28, 2001,

she discouraged Ms. Ferraro from speaking to Mr. Belsky. The second time she complained to Ms. Ferraro, on April 5, 2001 was *after* her angry and profane outburst at Mr. Nolan, the vice president of client services, in the meeting concerning office relocation. Ms. Absher's complaints on April 5, 2001, were of no greater magnitude than the orange and yellow pad incident.

The second basis for summary judgment is the lack of causal connection between Ms. Absher's complaint and her subsequent termination from employment. The complaints were of no great significance to Flexi. Rosemarie Ferraro agreed that Mr. Belsky was annoying, and undertook to warn him against behavior that would alienate other employees, regardless of whether it was at the legal threshold of sexual harassment (Bothe Aff. Ex. 8). When Ms. Absher claimed to be upset, Mr. Nolan and Ms. Ferraro responded with sympathy, and granted her request to take some time off. Ms. Absher then went to Mexico for two weeks, failing to fulfill her obligations with respect to the Flexi User Day client event (Bothe Aff. 19, 21).

At the beginning of 2001, Mr. Nolan was under instructions to reduce his expenses to match projected revenue, and his expenses were almost entirely his department's "head count." One employee was laid off in the first quarter and one resigned, but when projected revenue remained insufficient, Ms. Absher was laid off in

April.  There were two more lay offs of male employees in the third quarter before Mr.

Nolan's staffing was commensurate with revenue (Nolan dp. p. 58-79   ).

Mr. Nolan put his thought process into writing in a memo dated April 19, 2001

(Bothe Aff. Ex. 11), even before Ms. Absher failed to return on time from her sojourn to

Mexico.  Under the McDonnell Douglas analytical framework, even if Ms. Absher is

deemed to have a prima facie case, Flexi has certainly offered a plausible business-

related explanation for her termination.  Ms. Absher in turn has no evidence whatever

that would show that this explanation is a pretext, or that she was terminated for any

reason other than the obvious reasons articulated by Flexi, let alone in retaliation for a

complaint about Mr. Belsky, which Ms. Ferraro thought was appropriate and on which

she took corrective action.

That Ms. Absher's lay off occurred two weeks after her complaint about Mr.

Belsky is not evidence that it occurred because of her complaint.  Her lay off also

occurred at the beginning of the second quarter, after Mr. Nolan had assessed revenue

projections, and after his discussion with Ms. Absher on her lack of interest in any other

type of work.  (Nolan dp. pp. 18-22).  In the absence of any evidence of discrimination,

summary judgment may enter for the Defendants on the Fourth and Seventh Counts.

**VIII.    EIGHTH, NINTH AND TENTH COUNTS:  CONTRACTUAL CLAIMS.**

Ms. Absher seems to allege the violation of two contract rights: a right to a bonus and stock options (Eighth Count, ¶59g, h; Ninth Count, ¶65f, g; Tenth Count, ¶71f, g), and a right not to be terminated from employment (Eighth Count, ¶59h, Ninth Count, ¶67, Tenth Count, ¶74).

### A.    Bonus and Stock Options

As to the claim of a bonus, although the Amended Complaint alleges an implied contract that a "15% bonus would be paid upon good work performance," in fact Ms. Absher's letter of hire, dated June 4, 1998 and signed by her on June 5, 1998, does not guarantee her a bonus, but states only that she was "eligible to receive a bonus of 15% of your base salary.  This bonus is based on your individual and company performance and the completion of agreed upon milestones and objectives." (Bothe Aff. 6, Ex. 2)  Ms. Absher in fact received a bonus for both 1999 and 2000, even though the company's performance was poor during those years (Bothe Aff. 3, 6).  There is absolutely no evidence of a clear and definite promise of a 15% bonus, as required for contract formation either under implied contract or promissory estoppel, see Finley v. Aetna Life and Casualty Co. and  D'Ulisse-Cupo v The Board of Directors of Notre Dame High School, supra.  The letter of hire is clear evidence of no more than a representation of eligibility for a bonus based in part on company performance, and not a contractual commitment.

28

Moreover, the statute of limitations in Connecticut for claims for payment of remuneration for employment, Conn. Gen. Stat. 52-596. is two years.  The statute applies even though Ms. Absher alleges non-payment of a bonus as a breach of contract.  Williams v. Cushman and Wakefield of Connecticut, Inc. 1998 WL 246493 (Conn. Super. 1998).  Since this action was commenced on January 29, 2002, any claim for a bonus payable in 1998 is well outside the limitations period.

As to the allegation concerning stock options, Ms. Absher was in fact granted stock options under the FlexiInternational Software, Inc. Incentive Stock Option Agreement in 1999 and again in 2001 (Bothe Aff. 8).

## B.    Employment Termination

Lastly, Ms. Absher alleges in these counts that she had some form of contract right not to be terminated from employment.  As a general rule, contracts of permanent employment in Connecticut are terminable at will by the employer.  Davis v. Liberty Mutual Insurance Co., 218 F. Supp. 2d 256, 160 (D. Conn. 2002).  Although the rule of employment at will can be modified by the agreement of the parties, a plaintiff must prove that the employer had agreed, either by words or action or conduct, to undertake some form of actual contractual commitment under which the employee could not be terminated without cause.  Cardona v. Aetna Life and Casualty, 1998 WL 246634 at 5 (D. Conn. 1998).  An implied contract requires such actual agreement.  Coelho v. Posi-

29

Seal International, Inc. 208 Conn. 106, 111-112 (1998). A contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties. Davis v. Liberty Mutual Insurance Co., 218 F.Supp. 2d 256, 262 (D. Conn. 2002).

The requirement of an actual promise is the same for a contract formed under the theory of promissory estoppel. There are three essential elements to maintain a claim for promissory estoppel: (1) a clear and definite promise; (2) a reasonable expectation by the promissor that the promise would induce reliance; and (3) actual and reasonable reliance on the promise by the promissee. Davis v. Liberty Mutual Insurance Co., 218 F.Supp. 2d 256 (D.Conn 2002). "A fundamental element of promissory estoppel…is the existence of a clear and definite promise which a promissor could reasonably expected to induce reliance. Thus, a promissor is not liable to a promissee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all." Peralta v. Cendant Corp., 123 F Supp. 2d 65, 86 (D. Conn. 2000); D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 213 (1987) ("a fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise ...")

In order to alleviate any confusion as to whether employment security has been promised, the Connecticut Supreme Court long ago decreed that by eschewing

30

language that could reasonably be construed as basis for a contractual promise, or by including appropriate disclaimers of the intention to contract, employers can protect themselves against employee contract claims.  <u>Finley v. Aetna Life and Casualty Co.</u>, 202 Conn. 190, 214 fn 5 (1987).  The federal courts have recognized the substantial body of Connecticut and federal court decisions granting summary judgment in breach of contract cases where a personnel manual contains an expressed disclaimer.  <u>Davis v. Liberty Mutual Insurance Co.</u>, 218 F.Supp. 2d 256, 260 (D. Conn. 2002).

A plain statement by the employer that the employment relationship is at will, and that no conduct by the employer can be presumed to create a contract, negates claims both of implied contract and of promissory estoppel, since there can hardly be a clear and definite promise when an employer is expressly saying that there is no clear and definite promise.  The application for employment completed by Ms. Absher on June 1, 1998, contains the following statement (Bothe Aff. 4, Ex. 1).

> If I am hired, I understand that I am free to resign at any time, with or without cause and without prior notice, and the employer reserves the same rights to terminate my employment at any time, with or without cause and without prior notice, except as may be required by law.  This application does not constitute an agreement or contract for employment for any specified period or definite duration.  I understand that no supervisor or representative of the employer is authorized to make any assurances to the contrary and that no implied oral or written agreements contrary to the foregoing express language are valid unless they are in writing and signed by the employer's president.

31

The application form instructed Ms. Absher in bold capital letters: "**DO NOT SIGN UNTIL YOU HAVE READ THE ABOVE APPLICANT STATEMENT.**"  Ms. Absher placed her signature immediately below the following statement: "I certify that I have read, fully understand and accept all terms of the foregoing Applicant Statement." (Bothe Aff. Ex. 1).

If this were not sufficiently definitive, the employment letter sent to Ms. Absher on June 4, 1998, which she signed on June 5, 1998, stated: "You understand that your employment with FlexiInternational Software is at will."  (Bothe Aff. Ex. 2).  As opposed to these definitive disclaimers, the Amended Complaint merely alleges that Flexi created a contract by words, conduct and actions, without any specificity.  Mere generalizations, such as "company policies and procedures", are not sufficient to create an implied contract, especially in contrast to an unambiguous disclaimer.  Rizzo v. Haynes Construction Co., 2000 WL 1705643 (Conn. Super. 2000).

The Ninth Count, a claim of a breach of the covenant of good faith and fair dealing, is not a separate cause of action.  Under Connecticut law, the implied covenant of good faith and fair dealing is merely a principle of contract construction, and not an independent cause of action.  See Magnan v. Anaconda Industries, Inc., 193 Con. 558, 567 (1984).

In <u>Magnan</u>, the court recognized that the implied covenant of good faith and fair dealing is "[e]ssentially …a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." <u>Magnan</u>, supra, 193 Conn. 567. In other words, although it is true that every contract carries an implied covenant of good faith and fair dealing requiring that neither party act in bad faith to injure the right of the other to receive the benefits of the agreement, this is essentially a rule of construction designed to fulfill the reasonable expectations of the contracting parties. See e.g., <u>Warmer v. Konover</u>, 210 Conn. 150, 154-156 (1989); <u>Magnan</u>, supra, 193 Conn. 566. It was not, however, designed to create two separate causes of action for the exact same conduct. "Notwithstanding the fact that the Supreme Court recognized the covenant of good faith and fair dealing as a rule of contract construction, the covenant is widely misused and plead as a separate cause of action which generally does nothing more than restate a breach of contract claim, or which complains of unfair treatment regardless of the presence of a contract." <u>Casper v. Combustion Engineering, Inc.</u>, 1998 WL 389215 at 9 (June 23, 1998, Aurigemma. J.).

Here the Ninth Count is presented as nothing more than an alternate way of saying breach of contract, but even if it were a cause of action, a claim of breach of the covenant requires that there be a contract. <u>Maloney v. Connecticut Orthopedics, PC</u>, 47 F.Supp. 2d, 244, 249 (D. Conn. 1999) ("to assert a claim based on the covenant of

good faith and fair dealing, a contract must have been in existence.")  Since Ms.

Absher's employment relationship with Flexi was at will, and since she had no contract

formed either by implication or by promissory estoppel as to the duration of her

employment, she has no basis for a claim of breach of a covenant faith and fair dealing.

Although every employment relationship includes some contractual terms, such

as wages, hours and working conditions, the at will relationship does not limit the

terminability of an employee's employment.      Torosyan v. Boehringer-Ingelheim

Pharmaceuticals, Inc., 234 Conn. 1, 14 (1995).  A claim by a plaintiff that she somehow

came to believe she had a contract right cannot bind the employer without evidence of a

contractual commitment to be bound.  Christensen v. Bic Corp., 18 Conn. App. 451, 458

(1989).  Since Ms. Absher signed an acknowledgment that her employment was at will

and without contractual significance as to the duration of her employment, she cannot

claim the existence of an implied contract, and she cannot claim reasonable reliance on

a promise.  In the absence of a contract, she cannot claim a breach of a covenant of

good faith and fair dealing.  Therefore summary judgment may enter on the Eighth,

Ninth and Tenth Counts.

## IX.    THE ELEVENTH COUNT:  ASSAULT BY MR. BELSKY

The Eleventh Count alleges that "foregoing conduct" by Mr. Belsky constituted an

assault (¶ 76), and that "foregoing touching" by Mr. Belsky constituted a battery (¶ 77).

34

The Eleventh Count contains no attribution to an earlier count and no fact pleading. However, the First Count alleges three instances of physical contact of Ms. Absher by Mr. Belsky: "Belsky then touched plaintiff's breastplate three times" in August, 1999 (¶ 17c), "Belsky accessed the number from his computer and, while handing plaintiff the number, touched plaintiff's pelvic area. Belsky later apologized for such conduct" (¶ 17e), "Belsky picked up a pair of scissors with a yellow handle and while placing his arm around plaintiff held the scissors to her chest ..." (¶ 17h).

Under Connecticut law, an assault requires an overt act evidencing an attempt to do bodily harm, which actually falls short of a battery. Marczeski v. Law, 122 F.Supp. 2d 315, 325 (D. Conn. 2000); Stack v. Perez, 248 F.Supp. 2d 106, 110 (D. Conn. 2003). A battery is a completed assault. Smith v. City of New Haven, 166 F.Supp. 2d 636, 644 (D. Conn. 2001).

An actor is liable to another for battery if he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and a harmful contact with the person of the other directly or indirectly results. Altieri v. Colasso, 168 Conn. 329, 334 fn 3 (1975). To establish a claim for assault and battery, a plaintiff must prove that a defendant applied force or violence to her and that the application of force or violence was unlawful. Williams v. Lopez, 64 F.Supp. 2d 37, 47 (D. Conn. 1999).

35

Obviously, the law distinguishes inadvertent contact or overly friendly gestures from an attempt to do bodily harm, otherwise every ride in a crowded elevator could give rise to multiple claims of assault. Even crediting Ms. Absher's version of the three contact incidents, it is obvious that evidence of an intent to cause bodily harm, and evidence of actual harmful contact, is wholly lacking.

In the August, 1999 incident, Ms. Absher solicited Mr. Belsky to discuss surgery for breast cancer, which he did, although apparently his gestures were excessive. In the incident on April 2, 2001, it was again Ms. Absher coming to Mr. Belsky and asking him for a telephone number. In the course of responding, he touched her pelvic area but then apologized. Ms. Absher described it as: "he's also like motioning me over and he ends like petting my pelvic area." (Ptf. Dp., p. 150). Ms. Absher describes the incident of April 5, 2001 as "… we were walking down the hall coming from a meeting … he was on my left initially and he reached behind and went up, went over my shoulder, draped his arm over my shoulder and held the scissors chest level …". (Ptf. dp., p. 167). Nothing in these descriptions implies an intent to do bodily harm, and Ms. Absher does not claim that any bodily harm resulted.

In a similar case applying similar assault and battery principles, where plaintiffs testified to several instances of touching and patting, the court observed that to prove assault and battery, a plaintiff has the burden of producing sufficient evidence to show

an unlawful touching with the intent of inflicting injury, and that some form of harm must result. Without such proof, an action for assault and battery may not be maintained. Tarver v. Calex Corporation, 708 N.E. 2d 1041, 1051 (Ohio Court of Appeals, 1998). In the incident of touching on the pelvic area, Ms. Absher's description indicates that Mr. Belsky did not even intend to touch. If in the other two incidents he intended to touch Ms. Absher or her clothing, there is nothing in her testimony to suggest that he either intended to inflict bodily harm or that any such harm resulted. Indeed, in the breastplate tapping incident, it seems from her testimony that Mr. Belsky intended to be helpful in responding to her question about breast cancer surgery.

Ms. Absher attempts to make these incidents do double duty, to support a claim of sexual harassment, and to support a claim of assault and battery. However annoying they may have been, the incidents were far too innocuous to meet the standards of proof of either sexual harassment or assault and battery, which the law clearly reserves for significant interference with the legal rights of others. In the absence of any evidence to sustain the claim of assault or battery, summary judgment may be entered for Mr. Belsky on the Eleventh Count.

## X.    TWELFTH COUNT: NEGLIGENT SUPERVISION

In another effort to impute responsibility for Mr. Belsky's conduct to Flexi, the Twelfth Count alleges negligent supervision. However, an employer does not owe a

37

duty of care to an employee to protect her from another employee's actions unless the employer knows or has reason to know that the employee has a propensity to engage in tortious conduct.  See v. The Bridgeport Roman Catholic Diocesan Corp., 1997 WL 466498 (Conn. Super. 1997).  An employer is not liable to an employee for negligent supervision under Connecticut law absent evidence that the employer had reason to know of a fellow employee's propensity to engage in sexually harassing conduct. Wilburn v. Fleet Financial Group, Inc., 170 F.Supp. 2d 219, 242 (D. Conn. 2001).

In short, employers can be liable for negligent supervision only if an employee actually engages in sexual harassing or other tortious conduct.  Since Mr. Belsky's conduct did not constitute sexual harassment or other tortious conduct, Ms. Absher's claim lacks an essential element of negligent supervision.

Moreover, the tort of negligent supervision requires that the defendant employer know of an employee's alleged propensity prior to the conduct in question.  A plaintiff's own reporting of the alleged harassment is not enough to establish that the employer had prior knowledge.  Wilburn v. Fleet Financial Group, Inc., 170 F.Supp. 2d, supra, at 242.  Ms. Absher did not report the incident of March 28, 2001, in which Mr. Belsky did not touch her, although he held up the orange and yellow pad.  When she reported the other incidents on April 5, 2001, Rosemarie Ferraro, the human resources manager, took immediate corrective action.

38

Flexi's supervision of Mr. Belsky was not negligent because there is no duty to protect against annoyance, and because Ms. Ferraro acted promptly when specific complaints were made, even though the complaints were of annoying rather than tortious conduct.   In the absence of evidence of negligent supervision, summary judgment may enter for the Defendants on the Twelfth Count.

## XI.    THIRTEENTH COUNT: ERISA

The Thirteenth Count seems to allege that Ms. Absher was prevented from exercising her stock options under the Incentive Stock Option Agreement (Bothe Aff. Ex. 4), and claims that this was a violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq., known as "ERISA" (¶ 88).  The short answer to this claim is that stock option agreements are not ERISA plans.  Oatway v. American International Group, Inc., 325 F.3d 184, 189 (3d Cir. 2003); McCloone v. Intel Corp., 1 Fed. Appx. 715 (9th Cir. 2001).  The Flexi Incentive Stock Option Agreement was a standard incentive plan, not an employee welfare benefit plan covered by ERISA.  Since the cause of action claimed in the Thirteenth Count does not exist, summary judgment may be entered for the Defendants.

## XII.    CONCLUSION

Ms. Absher precipitated her termination from employment with an angry outburst against her supervisor, abandonment of her responsibilities for a client event, and

39

failure to return to work on time.  Even without this conduct,  a lack of foreseeable future productivity would have induced Mr. Nolan to lay her off from his department, as he did in 2001 with four other employees.

This lawsuit is at most a half-hearted attempt to portray Ms. Absher as a victim, long on accusations and conclusory statements and short on evidence.  She claims that women did not receive bonuses or stock options, when the records show plainly that many female employees did, including Ms. Absher.  She claims to have had a contractual right to employment, when she signed documents certifying that her employment was at will.  She claims an ERISA violation on a benefit plan that is not covered by ERISA.  And she claims to have been the victim of sexual harassment and assault when even her own descriptions of Mr. Belsky's conduct amount to no more than minor annoyances.  Finally, far from being a victim, Ms. Absher seems to have effectively abandoned her career at Flexi in favor of relocation to Mexico.

Plaintiffs like Ms. Absher apparently hope that a suplusage of counts, no matter how lame, must somehow result in a finding in her favor.  But not a single one of the Thirteen Counts in the amended complaint is sufficient as a matter of law, even considering the undisputed facts as Ms. Absher would have them.  Summary judgment should enter for the Defendants on the entire Amended Complaint.

THE DEFENDANTS,

**FlexiInternational Software, Inc. and
Jay Belsky**

By: _____

Michael N. LaVelle (CT 06170)
Pullman & Comley, LLC
850 Main Street
Bridgeport, CT  06604
Telephone:  (203) 330-2112
Facsimile:  (203) 330-2288

41

## **CERTIFICATION**

Pursuant to Fed. R. Civ. P. Rule 5 (b), I hereby certify that a copy of the above was sent via United States mail on September 8, 2004 to all counsel and pro se parties of record.

Michael J. Melly, Esq.
Bartinik, Gianacoplos, Bartinik,
Bartinik & Grater, P.C.
100 Fort Hill Road
Groton, CT  06340
(860) 445-8521
(860) 445-5873 facsimile

Michael N. LaVelle

BPRT/69369.1/MNL/515461v1

42